## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENNETH GORDON, Individually and On Behalf of All Others Similarly Situated, <br>           Plaintiff, <br><br> v. <br><br> MIMEDX GROUP, INC., PARKER H. PETIT, and MICHAEL J. SENKEN, <br><br>           Defendants. | **Case No.** <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Kenneth Gordon ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MiMedx Group, Inc. ("MiMedx" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.  This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired MiMedx securities between March 7, 2013 and February 21, 2018, both dates inclusive (the "Class Period"), seeking to

recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      MiMedx Group Inc. is a biopharmaceutical company that focuses on biomaterials for soft tissue repair, such as tendons, ligaments, and cartilage, as well as other biomaterial based products for other medical applications. MiMedx utilizes a number of different distributors to deliver its products. Among those distributors is AvKARE, Inc. ("AvKARE") – a federal contractor. Through MiMedx's distribution agreement with AvKARE, the Company was able to order products directly to Department of Veterans Affairs ("VA") hospitals at will. The revenues derived from MiMedx's distribution agreement with AvKARE made up a significant portion of the Company's total revenue. In 2013, for example, 56% of the Company's total revenues were attributable to its agreement with AvKARE.

3.      Founded in 2008, the Company is based in Marietta, Georgia, and its stock trades on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "MDXG."

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) MiMedx engaged in a "channel-stuffing" scheme designed to inappropriately recognize revenue that had not yet been realized; (ii) MiMedx failed to disclose its financial ties to physicians, as required by federal law; (iii) the Company lacked adequate internal controls over financial reporting; and (iv) as a result of the foregoing, MiMedx shares traded at artificially inflated prices during the Class Period, and class members suffered significant losses and damages.

5.      In December 2016, two former employees of MiMedx filed a complaint against the Company, alleging, among other things, retaliatory termination by MiMedx after reporting fraudulent revenue recognition practices (defined herein as the "Whistleblower Action"). In particular, those employees alleged that MiMedx had engaged in a "channel-stuffing scheme" to "fraudulently recognize revenue [purportedly earned under its distribution agreement with AvKARE] in its certified financial statements before the revenue had been realized or realizable and earned." The Company denied those claims and, in fact, sued the employees for tortious interference, among other things.

6.      In September 2017 several market research analysts published reports which, among other things, focused on the allegedly fraudulent revenue recognition practices of MiMedx alleged in the Whistleblower Action. Again, MiMedx denied these allegations and sued each of the research companies for, among other things, libel, slander, and defamation.

7.      On February 20, 2018, MiMedx issued a press release entitled "MiMedx Postpones Release of its Fourth Quarter and Fiscal Year 2017 Financial Results," announcing that its audit committee "ha[d] engaged independent legal and accounting advisors to conduct an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company." MiMedx advised investors that "Company executives are also reviewing, among other items, the accounting treatment of certain distributor contracts." The Company further announced that, because of this internal investigation, it would delay the release of its fourth quarter and fiscal year 2017 financial results.

8.      On this news, MiMedx's share price fell $5.72, or 39.53%, to close at $8.75 on February 20, 2018.

9.     Then, on February 22, 2018, the *Wall Street Journal* published an article entitled "MiMedx, Fast-Growing Developer of Tissue Graft Products, Didn't Report Payments to Doctors."  The article reported that MiMedx "has financial ties to more than 20 doctors . . . but the company hasn't reported these payments to the government under a 2013 law."

10.     Following publication of the *Wall Street Journal* article, MiMedx's share price fell $1.22, or 13.48%, over the next two trading sessions, closing at $7.83 on February 23, 2018.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

14.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  MiMedx securities trade on the NASDAQ, located within this Judicial District.

15.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.     Plaintiff, as set forth in the attached Certification, acquired MiMedx securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant MiMedx is incorporated in Florida, with principal executive offices located at 1775 West Oak Commons Court, NE Marietta, Georgia 30062.  MiMedx's securities trade on the NASDAQ under the ticker symbol "MDXG"

18.     Defendant Parker H. Petit ("Petit") has served at all relevant times as the Company's Chief Executive Officer ("CEO") and Chairman.

19.     Defendant Michael J. Senken ("Senken") has served at all relevant times as the Company's Chief Financial Officer ("CFO"), Principal Accounting Officer and Vice President.

20.     The Defendants referenced above in ¶¶ 18-19 are sometimes referred to herein as the "Individual Defendants."

21.     The Individual Defendants possessed the power and authority to control the contents of MiMedx's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

22.     MiMedx Group Inc. is a biopharmaceutical company that focuses on biomaterials for soft tissue repair, such as tendons, ligaments, and cartilage, as well as other biomaterial based products for other medical applications.

23.     In 2010, Congress enacted the Physician Payments Sunshine Act, (the "Sunshine Act"), with the goal of ensuring transparency in physicians' interactions with the pharmaceutical, biologic and medical device industries, as well as group purchasing organizations.  Pursuant to the Sunshine Act, since August 2013, pharmaceutical and medical device companies have been required to track and report to the Centers for Medicare and Medicaid Services ("CMS") information concerning their interactions with physicians.

24.     On April 29, 2012, MiMedx entered into a Production Distribution Agreement, subsequently amended March 25, 2013, with AvKARE—a federal supply schedule contractor and wholesale distributor of pharmaceuticals, disposable medical and surgical supplies, and other healthcare-related equipment—through which MiMedx distributed medical products to VA hospitals until that agreement expired on June 30, 2017.

### Materially False and Misleading Statements Issued During the Class Period

25.     The Class Period begins on March 7, 2013, when MiMedx issued a press release and filed the same as Exhibit 99.1 to a Form 8-K with the SEC, entitled "MiMedx Announces 2012 Results," announcing the financial and operating results for the period ended December 31, 2012.  The press release stated in part:

**Highlights of 2012 Results include:**

- ***Tripling of Revenue over 2011***
- ***First full year of positive Adjusted EBITDA***

- ***Adjusted EBITDA increased by nearly $9 million***
- ***Gross Margins at record level of 81%***

**Full Year and Fourth Quarter 2012 Results**

The Company recorded record revenue for the year ended December 31, 2012, with revenue of $27.1 million, more than three times 2011 full year revenue of $7.8 million. Earnings before interest, taxes, depreciation, amortization, impairment of intangibles, earn-out liability and share based compensation (Adjusted EBITDA*) for the year ended December 31, 2012, were $2.4 million, a $8.7 million improvement as compared to the Adjusted EBITDA loss of $6.3 million for the year ended December 31, 2011.

The fourth quarter of 2012 marked the 8th consecutive quarter in which the Company reported improved gross margins. The Company's 2012 gross margins of 81% are nearly a forty-two percentage point improvement over full year 2011 gross margins of 57%.

The Company recorded record revenue for the quarter ended December 31, 2012, with revenue of $10.5 million, an increase of 299% or $7.9 million over fourth quarter of 2011 revenue of $2.6 million, and a 32% increase over the third quarter of 2012. Adjusted EBITDA* for the quarter ended December 31, 2012, were $411,000, a $2.1 million improvement as compared to the Adjusted EBITDA loss of $1.64 million for the quarter ended December 31, 2011.

26. On March 15, 2013, MiMedx filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2012 (the "2012 10-K"). The income statement included in the 2012 10-K stated:

## MIMEDX GROUP, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF OPERATIONS

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| REVENUES: | | |
| Net sales | $ 27,053,773 | $ 7,760,446 |
| | | |
| OPERATING COSTS AND EXPENSES: | | |
| Cost of products sold | 5,188,378 | 3,357,909 |
| Research and development expenses | 2,884,546 | 2,976,313 |
| Selling, general and administrative expenses | 20,970,687 | 11,181,437 |
| Impairment of intangible assets | 1,798,495 | - |
| Fair value adjustment of earn-out liability | 1,567,050 | 5,803 |
| LOSS FROM OPERATIONS | (5,355,383) | (9,761,016) |
| | | |
| OTHER INCOME (EXPENSE), net | | |
| Amortization of debt discount | (1,714,101) | (315,152) |
| Interest expense, net | (592,892) | (117,818) |
| | | |
| LOSS BEFORE INCOME TAXES | (7,662,376) | (10,193,986) |
| Income taxes | - | - |
| | | |
| NET LOSS | $ (7,662,376) | $ (10,193,986) |
| | | |
| Net loss per common share | | |
| Basic and diluted | $ (0.09) | $ (0.14) |
| | | |
| Shares used in computing net loss per common share | | |
| Basic and diluted | 81,646,295 | 72,450,337 |

27.     In the 2012 10-K, MiMedx assured investors of the effectiveness of the Company's internal controls, stating in relevant part:

**Item 9A. Controls and Procedures**

**Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures" within the meaning of Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the Exchange Act. Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed by the Company in the reports filed under the Exchange Act, such as this Annual Report on Form 10-K, is recorded, processed, summarized and reported within the time periods specified in the U.S. Securities and Exchange Commission's rules and forms. Our disclosure controls and procedures include controls and procedures designed to provide reasonable assurance that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding

required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and no evaluation of controls and procedures can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. Management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by Rule 13a-15(b) of the Exchange Act, prior to filing this Annual Report on Form 10-K, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this Annual Report on Form 10-K.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended). Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2012. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control-Integrated Framework. Our management has concluded that, as of December 31, 2012, our internal control over financial reporting is effective based on these criteria.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Also, projections of any evaluation of the effectiveness of internal controls over financial reporting to future periods are subject to the risk that the controls may become inadequate.

An evaluation was also performed under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of any changes in our internal control over financial reporting that occurred during our last fiscal quarter and that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. That evaluation did not identify any change in our internal control over financial reporting that occurred during our latest fiscal quarter that has materially affected,

or is reasonably likely to materially affect, our internal control over financial reporting.

Cherry, Bekaert & Holland, L.L.P., an independent registered accounting firm, as auditors of our financial statements have issued an attestation report on the effectiveness of the Company's and its subsidiaries' internal control over financial reporting as of December 31, 2012. Cherry, Bekaert & Hollard, L.L.P.'s report is included in this report.

28.     The 2012 10-K contained certifications pursuant to the Sarbanes-Oxley Act of

2002 ("SOX") signed by the Individual Defendants, who certified that:

1. I have reviewed this annual report on Form 10-K of MiMedx Group, Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in the Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared,

(b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles,

(c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation, and

(d) disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

29.     On May 10, 2013, MiMedx filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2013 (the "Q1 2013 10-Q"), providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(unaudited)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2013 | 2012 |
| Revenues: | | |
| Net sales | $ 11,556,493 | $ 3,705,808 |
| Cost of sales | 1,905,020 | 958,855 |
| Gross margin | 9,651,473 | 2,746,953 |
| | | |
| Operating expenses: | | |
| Research and development expenses | 1,246,757 | 407,072 |
| Selling, general and administrative expenses | 8,369,010 | 2,637,269 |
| Amortization of intangible assets | 262,596 | 333,977 |
| | | |
| Operating income (loss) | (226,890) | (631,365) |
| | | |
| Other income (expense), net | | |
| Amortization of debt discount | (1,328,439) | (310,477) |
| Interest expense, net | (14,804) | (151,810) |
| | | |
| Income (loss) before income tax provision | (1,570,133) | (1,093,652) |
| Income tax provision | (50,275) | - |
| | | |
| Net Income (loss) | $ (1,620,408) | $ (1,093,652) |
| | | |
| Net income (loss) per common share - basic and diluted | $ (0.02) | $ (0.01) |
| | | |
| Weighted average shares outstanding - basic and diluted | 93,128,466 | 74,872,122 |

30.     In the Q1 2013 10-Q, the Company stated in part:

**Item 4. Controls and Procedures**

**Disclosure Controls and Procedures**

As required by Rule 13a-15(b) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), we have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. This evaluation was carried out under the supervision and with the participation of our management, including our Chief Executive Officer and Principal Financial Officer. Based upon that evaluation, our Chief Executive Officer and Principal Financial Officer concluded that our controls and procedures were effective as of the end of the period covered by this report.

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms.

Disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Principal Financial Officer, as appropriate, to allow timely decisions regarding disclosures.

**Changes in Internal Control over Financial Reporting**

There was no change in our internal control over financial reporting that occurred during the three months ended March 31, 2013, that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

31.     The Q1 2013 10-Q also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

32.     On August 8, 2013, MiMedx filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2013 (the "Q2 2013 10-Q"), providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2013 | 2012 | 2013 | 2012 |
| Revenues: | | | | |
| Net sales | $ 13,514,743 | $ 4,884,256 | $ 25,071,235 | $ 8,590,064 |
| Cost of sales | 2,198,482 | 1,114,926 | 4,103,502 | 2,073,781 |
| Gross margin | 11,316,261 | 3,769,330 | 20,967,733 | 6,516,283 |
| | | | | |
| Operating expenses: | | | | |
| Research and development expenses | 924,468 | 503,086 | 2,171,222 | 910,158 |
| Selling, general and administrative expenses | 10,868,372 | 3,049,783 | 19,237,384 | 5,687,052 |
| Amortization of intangible assets | 267,638 | 333,977 | 530,234 | 667,954 |
| | | | | |
| Operating income (loss) | (744,217) | (117,516) | (971,107) | (748,881) |
| | | | | |
| Other income (expense), net | | | | |
| Amortization of debt discount | — | (472,749) | (1,328,439) | (783,226) |
| Interest expense, net | (13,172) | (153,804) | (27,976) | (305,614) |
| | | | | |
| Income (loss) before income tax provision | (757,389) | (744,069) | (2,327,522) | (1,837,721) |
| Income tax provision | — | — | (50,275) | — |
| | | | | |
| Net Income (loss) | $ (757,389) | $ (744,069) | $ (2,377,797) | $ (1,837,721) |
| | | | | |
| Net income (loss) per common share - basic and diluted | $ (0.01) | $ (0.01) | $ (0.03) | $ (0.02) |
| | | | | |
| Weighted average shares outstanding - basic and diluted | 95,988,100 | 79,952,542 | 94,599,406 | 77,416,073 |

See notes to condensed consolidated financial statements

33.      The Q2 2013 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*.  The Q2 2013 10-Q also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

34.      On November 8, 2013, MiMedx filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September

30, 2013 (the "Q3 2013 10-Q"), providing, among other things, the Company's consolidated financial results for that period:

### MIMEDX GROUP, INC. AND SUBSIDIARIES
### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
#### (unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| Net sales | $16,115,708 | $ 7,954,046 | $41,186,943 | $16,544,110 |
| Cost of sales | 2,113,438 | 1,425,336 | 6,216,940 | 3,499,117 |
| Gross margin | 14,002,270 | 6,528,710 | 34,970,003 | 13,044,993 |
| Operating expenses: | | | | |
| Research and development expenses | 1,287,361 | 838,690 | 3,458,585 | 1,748,847 |
| Selling, general and administrative expenses | 12,711,225 | 5,756,559 | 31,948,607 | 11,443,611 |
| Impairment of intangible assets | — | 1,798,495 | — | 1,798,495 |
| Fair value adjustment of earn-out liability | — | 1,320,000 | — | 1,320,000 |
| Amortization of intangible assets | 259,575 | 449,692 | 789,809 | 1,117,646 |
| Operating income (loss) | (255,891) | (3,634,726) | (1,226,998) | (4,383,606) |
| Other income (expense), net | | | | |
| Amortization of debt discount | — | (439,064) | (1,328,439) | (1,222,290) |
| Interest expense, net | (4,527) | (145,582) | (32,503) | (451,196) |
| Income (loss) before income tax provision | (260,418) | (4,219,372) | (2,587,940) | (6,057,092) |
| Income tax provision | (46,700) | — | (96,975) | — |
| Net Income (loss) | $ (307,118) | $(4,219,372) | $ (2,684,915) | $ (6,057,092) |
| Net income (loss) per common share - basic and diluted | $ — | $ (0.05) | $ (0.03) | $ (0.07) |
| Weighted average shares outstanding - basic and diluted | 96,914,856 | 84,493,164 | 95,429,988 | 84,091,014 |

35.    The Q3 2013 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*.  The Q3 2013 10-Q also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

36.     On March 4, 2014, MiMedx filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013 (the "2013 10-K"), providing, among other things, the Company's consolidated financial results for those periods:

**MIMEDX GROUP, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2013 | 2012 | 2011 |
| Net sales | $ 59,180,734 | $ 27,053,773 | $ 7,760,446 |
| Cost of sales | 9,328,114 | 5,188,378 | 3,357,909 |
| Gross margin | 49,852,620 | 21,865,395 | 4,402,537 |
| | | | |
| Operating expenses: | | | |
| Research and development expenses | 4,843,457 | 2,884,546 | 2,976,313 |
| Selling, general and administrative expenses | 46,225,657 | 19,590,446 | 9,845,529 |
| Impairment of intangible assets | 368,102 | 1,798,495 | — |
| Fair value adjustment of earn-out liability | — | 1,567,050 | 5,803 |
| Amortization of intangible assets | 1,053,971 | 1,380,241 | 1,335,908 |
| | | | |
| Operating income (loss) | (2,638,567) | (5,355,383) | (9,761,016) |
| | | | |
| Other income (expense), net | | | |
| Amortization of debt discount | (1,328,439) | (1,714,101) | (315,152) |
| Interest expense, net | (45,233) | (592,892) | (117,818) |
| | | | |
| Income (loss) before income tax provision | (4,012,239) | (7,662,376) | (10,193,986) |
| Income tax provision | (99,614) | — | — |
| | | | |
| Net income (loss) | $ (4,111,853) | $ (7,662,376) | $ (10,193,986) |
| | | | |
| Net income (loss) per common share - basic and diluted | $ (0.04) | $ (0.09) | $ (0.14) |
| | | | |
| Weighted average shares outstanding - basic and diluted | 96,285,504 | 81,646,295 | 72,450,337 |

37.     The 2013 10-K further reported that distribution through its distribution agreement with AvKARE accounted for 56% of the Company's total revenues. Specifically, the Company stated:

**Customer Concentration**

We provide products to Government accounts, including the Veteran's Administration, through a distributor relationship with AvKARE, Inc., which is a

veteran-owned General Services Administration Federal Supply Schedule Contractor. In 2013, sales to this distributor represented 56% of our revenues. The distribution agreement has a term of three years ending in April 2015, and has the potential to be extended for three additional one year terms. This distribution relationship is different than our other distribution relationships in that our direct sales force calls on Government accounts to generate orders for our products, which are placed directly with the distributor. Thus, if our agreement with this distributor was terminated for any reason, including because this distributor was no longer a Federal Supply Schedule Contractor, we believe we could retain or regain that business by contracting with another distributor to service these government accounts or becoming a General Services Administration Federal Supply Schedule Contractor ourselves. Nevertheless, any disruption in the inclusion of our products on the Federal Supply Schedule for any reason could materially and adversely affect our business, revenues and results of operations.

Another of our distributors represented an additional 10% of our total revenues in 2013. Our current distribution agreement with this distributor has a three year term, expiring in November 2015.

38.     The 2013 10-K also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*.  The 2013 10-K also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

39.     On May 12, 2014, MiMedx filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q"), providing, among other things, the Company's consolidated financial results for that period:

17

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(unaudited)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| Net sales | $ 19,559,188 | $ 11,556,493 |
| Cost of sales | 2,977,275 | 1,905,020 |
| Gross margin | 16,581,913 | 9,651,473 |
| | | |
| Operating expenses: | | |
| Research and development expenses | 1,390,044 | 1,246,757 |
| Selling, general and administrative expenses | 15,851,553 | 8,369,010 |
| Amortization of intangible assets | 231,331 | 262,596 |
| | | |
| Operating income (loss) | (891,015) | (226,890) |
| | | |
| Other income (expense), net | | |
| Amortization of debt discount | — | (1,328,439) |
| Interest expense, net | (21,024) | (14,804) |
| | | |
| Income (loss) before income tax provision | (912,039) | (1,570,133) |
| Income tax provision | (10,033) | (50,275) |
| | | |
| Net income (loss) | $ (922,072) | $ (1,620,408) |
| | | |
| Net income (loss) per common share - basic and diluted | $ (0.01) | $ (0.02) |
| | | |
| Weighted average shares outstanding - basic and diluted | 105,358,694 | 93,128,466 |

40.    The Q1 2014 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*.  The Q1 2014 10-Q also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

41.    On August 11, 2014, filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q"), providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Net sales | $ 25,573,198 | $ 13,514,743 | $ 45,132,386 | $ 25,071,235 |
| Cost of sales | 2,739,967 | 2,198,482 | 5,717,243 | 4,103,502 |
| Gross margin | 22,833,231 | 11,316,261 | 39,415,143 | 20,967,733 |
| | | | | |
| Operating expenses: | | | | |
| Research and development expenses | 1,799,803 | 924,468 | 3,189,846 | 2,171,222 |
| Selling, general and administrative expenses | 21,193,232 | 10,868,372 | 37,044,785 | 19,237,384 |
| Amortization of intangible assets | 231,959 | 267,638 | 463,290 | 530,234 |
| Operating income (loss) | (391,763) | (744,217) | (1,282,778) | (971,107) |
| | | | | |
| Other income (expense), net | | | | |
| Amortization of debt discount | — | — | — | (1,328,439) |
| Interest expense, net | (8,429) | (13,172) | (29,453) | (27,976) |
| | | | | |
| Income (loss) before income tax provision | (400,192) | (757,389) | (1,312,231) | (2,327,522) |
| Income tax provision | 10,033 | — | — | (50,275) |
| | | | | |
| Net income (loss) | $ (390,159) | $ (757,389) | $ (1,312,231) | $ (2,377,797) |
| | | | | |
| Net income (loss) per common share - basic and diluted | $ — | $ (0.01) | $ (0.01) | $ (0.03) |
| | | | | |
| Weighted average shares outstanding - basic and diluted | 105,757,178 | 95,988,100 | 105,552,330 | 94,599,406 |

42.     The Q2 2014 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*.  The Q2 2014 10-Q also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

43.     On November 10, 2014, filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q"), providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(unaudited)

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2014 | 2013 | 2014 | 2013 |
| Net sales | $ 33,517,762 | $ 16,115,708 | $ 78,650,148 | $ 41,186,943 |
| Cost of sales | 3,348,005 | 2,113,438 | 9,065,248 | 6,216,940 |
| Gross margin | 30,169,757 | 14,002,270 | 69,584,900 | 34,970,003 |
|  |  |  |  |  |
| Operating expenses: |  |  |  |  |
| Research and development expenses | 2,014,306 | 1,287,361 | 5,204,153 | 3,458,585 |
| Selling, general and administrative expenses | 24,192,479 | 12,711,225 | 61,237,264 | 31,948,607 |
| Amortization of intangible assets | 232,079 | 259,575 | 695,368 | 789,809 |
| Operating income (loss) | 3,730,893 | (255,891) | 2,448,115 | (1,226,998) |
|  |  |  |  |  |
| Other income (expense), net |  |  |  |  |
| Amortization of debt discount | — | — | — | (1,328,439) |
| Interest expense, net | (9,126) | (4,527) | (38,579) | (32,503) |
|  |  |  |  |  |
| Income (loss) before income tax provision | 3,721,767 | (260,418) | 2,409,536 | (2,587,940) |
| Income tax provision | (22,062) | (46,700) | (22,062) | (96,975) |
|  |  |  |  |  |
| Net income (loss) | $ 3,699,705 | $ (307,118) | $ 2,387,474 | $ (2,684,915) |
|  |  |  |  |  |
| Net income (loss) per common share - basic | $ 0.03 | $ — | $ 0.02 | $ (0.03) |
|  |  |  |  |  |
| Net income (loss) per common share - diluted | $ 0.03 | $ — | $ 0.02 | $ (0.03) |
|  |  |  |  |  |
| Weighted average shares outstanding - basic | 105,756,945 | 96,914,856 | 105,331,344 | 95,429,988 |
|  |  |  |  |  |
| Weighted average shares outstanding - diluted | 112,814,658 | 96,914,856 | 112,525,016 | 95,429,988 |

44.     The Q3 2014 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*.  The Q3 2014 10-Q also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

45.     On March 13, 2015, MiMedx filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 10-K"), providing, among other things, the Company's consolidated financial results for those periods:

**MIMEDX GROUP, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in thousands, except share and per share data)**

| | Years Ended December 31, | | |
| | 2014 | 2013 | 2012 |
|---|---|---|---|
| Net sales | $ 118,223 | $ 59,181 | $ 27,053 |
| Cost of sales | 12,665 | 9,328 | 5,188 |
| Gross margin | 105,558 | 49,853 | 21,865 |
| | | | |
| Operating expenses: | | | |
| Research and development expenses | 7,050 | 4,843 | 2,885 |
| Selling, general and administrative expenses | 90,480 | 46,227 | 19,591 |
| Impairment of intangible assets | — | 368 | 1,798 |
| Fair value adjustment of earn-out liability | — | — | 1,567 |
| Amortization of intangible assets | 928 | 1,054 | 1,380 |
| | | | |
| Operating income (loss) | 7,100 | (2,639) | (5,356) |
| | | | |
| Other income (expense), net | | | |
| Amortization of debt discount | — | (1,328) | (1,714) |
| Interest expense, net | (48) | (45) | (593) |
| | | | |
| Income (loss) before income tax provision | 7,052 | (4,012) | (7,663) |
| Income tax provision | (832) | (100) | — |
| | | | |
| Net income (loss) | $ 6,220 | $ (4,112) | $ (7,663) |
| | | | |
| Net income (loss) per common share - basic | $ 0.06 | $ (0.04) | $ (0.09) |
| | | | |
| Net income (loss) per common share - diluted | $ 0.05 | $ (0.04) | $ (0.09) |
| | | | |
| Weighted average shares outstanding - basic | 105,793,008 | 96,285,504 | 81,646,295 |
| | | | |
| Weighted average shares outstanding - diluted | 113,295,504 | 96,285,504 | 81,646,295 |

46.     In the 2014 10-K, the Company further reported that distribution through its distribution agreement with AvKARE accounted for 34% of the Company's total revenues. Specifically, the Company provided:

**Customer Concentration**

In 2014, we provided products to Government accounts, including the Department of Veteran's Affairs, through a distributor relationship with AvKARE, Inc., which is a veteran-owned General Services Administration Federal Supply Schedule (FSS) Contractor. In 2014, sales to this distributor

represented 34% of our revenues. The distribution agreement has a term of three years ending in April 2015, but provides a renewal clause for up to two successive terms of one year each following expiration of the initial term. In 2014, we applied for, and in early 2015 received, our own FSS contract with a term through 2020, which will allow us to sell directly to governmental accounts.

47.    The 2014 10-K also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*.   The 2014 10-K also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra.*

48.    On May 1, 2015, filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"), providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands except, share and per share data)
(unaudited)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Net sales | $ 40,767 | $ 19,559 |
| Cost of sales | 5,148 | 2,977 |
| Gross margin | 35,619 | 16,582 |
| | | |
| Operating expenses: | | |
| Research and development expenses | 1,831 | 1,390 |
| Selling, general and administrative expenses | 29,308 | 15,852 |
| Amortization of intangible assets | 233 | 231 |
| Operating income (loss) | 4,247 | (891) |
| | | |
| Other income (expense), net | | |
| Interest expense, net | (14) | (21) |
| | | |
| Income (loss) before income tax provision | 4,233 | (912) |
| Income tax provision | (146) | (10) |
| | | |
| Net Income (loss) | $ 4,087 | $ (922) |
| | | |
| Net income (loss) per common share - basic | $ 0.04 | $ (0.01) |
| | | |
| Net income (loss) per common share - diluted | $ 0.04 | $ (0.01) |
| | | |
| Weighted average shares outstanding - basic | 105,820,335 | 105,358,694 |
| | | |
| Weighted average shares outstanding - diluted | 113,638,551 | 105,358,694 |

49.     The Q1 2015 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*.  The Q1 2015 10-Q also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

50.     On August 7, 2015, filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2015

(the "Q2 2015 10-Q"), providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2015 | 2014 | 2015 | 2014 |
| Net sales | $ 45,679 | $ 25,573 | $ 86,446 | $ 45,132 |
| Cost of sales | 5,089 | 2,740 | 10,237 | 5,717 |
| Gross margin | 40,590 | 22,833 | 76,209 | 39,415 |
| | | | | |
| Operating expenses: | | | | |
| Research and development expenses | 2,054 | 1,800 | 3,885 | 3,190 |
| Selling, general and administrative expenses | 32,651 | 21,193 | 61,960 | 37,045 |
| Amortization of intangible assets | 233 | 232 | 465 | 463 |
| Operating income (loss) | 5,652 | (392) | 9,899 | (1,283) |
| | | | | |
| Other income (expense), net | | | | |
| Interest income (expense), net | 1 | (8) | (13) | (29) |
| | | | | |
| Income (loss) before income tax provision | 5,653 | (400) | 9,886 | (1,312) |
| Income tax provision | (223) | 10 | (369) | — |
| | | | | |
| Net income (loss) | $ 5,430 | $ (390) | $ 9,517 | $ (1,312) |
| | | | | |
| Net income (loss) per common share - basic | $ 0.05 | $ 0.00 | $ 0.09 | $ (0.01) |
| | | | | |
| Net income (loss) per common share - diluted | $ 0.05 | $ 0.00 | $ 0.08 | $ (0.01) |
| | | | | |
| Weighted average shares outstanding - basic | 106,211,120 | 105,757,178 | 106,013,752 | 105,552,330 |
| | | | | |
| Weighted average shares outstanding - diluted | 114,186,329 | 105,757,178 | 113,892,087 | 105,552,330 |

51.     The Q2 2015 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*. The Q2 2015 10-Q also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

52.     On November 6, 2015, filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"), providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2015 | 2014 | 2015 | 2014 |
| Net sales | $ 49,015 | $ 33,518 | $ 135,461 | $ 78,650 |
| Cost of sales | 4,979 | 3,348 | 15,217 | 9,065 |
| Gross margin | 44,036 | 30,170 | 120,244 | 69,585 |
| | | | | |
| Operating expenses: | | | | |
| Research and development expenses | 2,187 | 2,014 | 6,072 | 5,204 |
| Selling, general and administrative expenses | 34,901 | 24,193 | 96,860 | 61,238 |
| Amortization of intangible assets | 234 | 232 | 699 | 695 |
| Operating income | 6,714 | 3,731 | 16,613 | 2,448 |
| | | | | |
| Other income (expense), net | | | | |
| Interest income (expense), net | (5) | (9) | (18) | (39) |
| | | | | |
| Income before income tax provision | 6,709 | 3,722 | 16,595 | 2,409 |
| Income tax provision | (158) | (22) | (527) | (22) |
| | | | | |
| Net income | $ 6,551 | $ 3,700 | $ 16,068 | $ 2,387 |
| | | | | |
| Net income per common share - basic | $ 0.06 | $ 0.03 | $ 0.15 | $ 0.02 |
| | | | | |
| Net income per common share - diluted | $ 0.06 | $ 0.03 | $ 0.14 | $ 0.02 |
| | | | | |
| Weighted average shares outstanding - basic | 106,511,294 | 105,756,945 | 106,178,136 | 105,331,344 |
| | | | | |
| Weighted average shares outstanding - diluted | 114,556,036 | 112,814,658 | 114,110,120 | 112,525,016 |

53.     The Q3 2015 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*.  The Q3 2015 10-Q also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

54.     On February 29, 2016, MiMedx filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 10-K"), providing, among other things, the Company's consolidated financial results for those periods:

**MIMEDX GROUP, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in thousands, except share and per share data)**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Net sales | $ 187,296 | $ 118,223 | $ 59,181 |
| Cost of sales | 20,202 | 12,665 | 9,328 |
| Gross margin | 167,094 | 105,558 | 49,853 |
| Operating expenses: | | | |
| Research and development expenses | 8,413 | 7,050 | 4,843 |
| Selling, general and administrative expenses | 133,384 | 90,480 | 46,227 |
| Impairment of intangible assets | — | — | 368 |
| Amortization of intangible assets | 933 | 928 | 1,054 |
| Operating income (loss) | 24,364 | 7,100 | (2,639) |
| Other income (expense), net | | | |
| Amortization of debt discount | — | — | (1,328) |
| Interest expense, net | (86) | (48) | (45) |
| Income (loss) before income tax provision | 24,278 | 7,052 | (4,012) |
| Income tax provision | 5,168 | (832) | (100) |
| Net income (loss) | $ 29,446 | $ 6,220 | $ (4,112) |
| Net income (loss) per common share - basic | $ 0.28 | $ 0.06 | $ (0.04) |
| Net income (loss) per common share - diluted | $ 0.26 | $ 0.05 | $ (0.04) |
| Weighted average shares outstanding - basic | 105,929,205 | 105,793,008 | 96,285,504 |
| Weighted average shares outstanding - diluted | 113,628,482 | 113,295,504 | 96,285,504 |

55.     The 2015 10-K further reported that distribution through its distribution agreement with AvKARE accounted for 24% of the Company's total revenues. Specifically, the Company provided:

26

**Customer Concentration**

The Company provides products to Government accounts, including the Department of Veteran's Affairs, through a distributor relationship with AvKARE, Inc. ("AvKARE"), which is a veteran-owned General Services Administration Federal Supply Schedule (FSS) Contractor. In addition, in 2014, the Company applied for, and in early 2015 received, its own FSS contract with a term through

2020, which allows the Company to sell directly to Government accounts. The initial term of the distribution agreement with AvKARE was due to expire in April 2015 but it has been extended via amendment through June 30, 2017, with the ability to further extend under certain circumstances. The agreement with AvKARE, as amended, allows the Company to sell its products directly on the FSS. Ultimately, the Company intends to transition all of its Government sales to sales sold directly to Government accounts on the FSS. In 2015, sales to AvKARE represented approximately 24% of total revenue.

56.     The 2015 10-K also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*.   The 2015 10-K also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

57.     On May 10, 2016, MiMedx filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q"), providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| Net sales | $ 53,367 | $ 40,767 |
| Cost of sales | 7,946 | 5,148 |
| Gross margin | 45,421 | 35,619 |
| | | |
| Operating expenses: | | |
| Research and development expenses | 2,496 | 1,831 |
| Selling, general and administrative expenses | 40,648 | 29,308 |
| Amortization of intangible assets | 810 | 233 |
| Operating income | 1,467 | 4,247 |
| | | |
| Other income (expense), net | | |
| Interest (expense), net | (56) | (14) |
| | | |
| Income before income tax provision | 1,411 | 4,233 |
| Income tax provision | (214) | (146) |
| | | |
| Net income | $ 1,197 | $ 4,087 |
| | | |
| Net income per common share - basic | $ 0.01 | $ 0.04 |
| | | |
| Net income per common share - diluted | $ 0.01 | $ 0.04 |
| | | |
| Weighted average shares outstanding - basic | 105,538,271 | 105,820,335 |
| | | |
| Weighted average shares outstanding - diluted | 112,039,860 | 113,638,551 |

58.     The Q1 2016 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*.  The Q1 2016 10-Q also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

59.     On August 2, 2016, MiMedx filed a quarterly report on Form 10-Q with the SEC,
announcing the Company's financial and operating results for the quarter ended June 30, 2016
(the "Q2 2016 10-Q"), providing, among other things, the Company's consolidated financial
results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2016 | 2015 | 2016 | 2015 |
| Net sales | $ 57,342 | $ 45,679 | $ 110,710 | $ 86,446 |
| Cost of sales | 7,394 | 5,089 | 15,341 | 10,237 |
| Gross margin | 49,948 | 40,590 | 95,369 | 76,209 |
| | | | | |
| Operating expenses: | | | | |
| Research and development expenses | 3,168 | 2,054 | 5,664 | 3,885 |
| Selling, general and administrative expenses | 42,772 | 32,651 | 83,420 | 61,960 |
| Amortization of intangible assets | 447 | 233 | 1,257 | 465 |
| Operating income | 3,561 | 5,652 | 5,028 | 9,899 |
| | | | | |
| Other income (expense), net | | | | |
| Interest income (expense), net | (111) | 1 | (167) | (13) |
| | | | | |
| Income before income tax provision | 3,450 | 5,653 | 4,861 | 9,886 |
| Income tax provision | (1,475) | (223) | (1,689) | (369) |
| | | | | |
| Net income | $ 1,975 | $ 5,430 | $ 3,172 | $ 9,517 |
| | | | | |
| Net income per common share - basic | $ 0.02 | $ 0.05 | $ 0.03 | $ 0.09 |
| | | | | |
| Net income per common share - diluted | $ 0.02 | $ 0.05 | $ 0.03 | $ 0.08 |
| | | | | |
| Weighted average shares outstanding - basic | 106,191,932 | 106,211,120 | 105,873,727 | 106,013,752 |
| | | | | |
| Weighted average shares outstanding - diluted | 112,148,415 | 114,186,329 | 112,095,051 | 113,892,087 |

60.     The Q2 2016 10-Q also assured investors of the effectiveness of MiMedx's
internal control over financial reporting financial reporting by incorporating "Controls and
Procedures" disclosures substantially similar to those in ¶30, *supra*.  The Q2 2016 10-Q also

contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

61.　　On November 8, 2016, MiMedx filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q"), providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2016 | 2015 | 2016 | 2015 |
| Net sales | $ 64,429 | $ 49,015 | $ 175,139 | $ 135,461 |
| Cost of sales | 7,997 | 4,979 | 23,338 | 15,217 |
| Gross margin | 56,432 | 44,036 | 151,801 | 120,244 |
| | | | | |
| Operating expenses: | | | | |
| Research and development expenses | 2,919 | 2,187 | 8,582 | 6,072 |
| Selling, general and administrative expenses | 48,179 | 34,901 | 131,599 | 96,860 |
| Amortization of intangible assets | 631 | 234 | 1,889 | 699 |
| Operating income | 4,703 | 6,714 | 9,731 | 16,613 |
| | | | | |
| Other income (expense), net | | | | |
| Interest income (expense), net | (87) | (5) | (254) | (18) |
| | | | | |
| Income before income tax provision | 4,616 | 6,709 | 9,477 | 16,595 |
| Income tax provision | (1,295) | (158) | (2,984) | (527) |
| | | | | |
| Net income | $ 3,321 | $ 6,551 | $ 6,493 | $ 16,068 |
| | | | | |
| Net income per common share - basic | $ 0.03 | $ 0.06 | $ 0.06 | $ 0.15 |
| | | | | |
| Net income per common share - diluted | $ 0.03 | $ 0.06 | $ 0.06 | $ 0.14 |
| | | | | |
| Weighted average shares outstanding - basic | 105,991,990 | 106,511,294 | 105,927,890 | 106,178,136 |
| | | | | |
| Weighted average shares outstanding - diluted | 112,361,179 | 114,556,036 | 112,193,701 | 114,110,120 |

62.     The Q3 2016 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*.  The Q3 2016 10-Q also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

63.     On December 15, 2016, two former employees of MiMedx – Jess Kruchoski and Luke Tornquist – filed a lawsuit in the United States District Court for the District of Minnesota (C.A. No. 16-cv-04171) against MiMedx and Petit (the "Whistleblower Lawsuit"). Among other things, that lawsuit put forward detailed allegations about a "channel-stuffing scheme" orchestrated by MiMedx and its executives to "fraudulently recognize revenue in its certified financial statements before the revenue had been realized or realizable and earned." This "channel-stuffing scheme," it was alleged, "implicates" MiMedx's distribution agreement with AvKARE, which permitted MiMedx to order certain products for delivery to VA hospitals. Because "[n]either AvKare nor the end customer—the  VA—requests the" orders, and AvKare did not "exercise physical control over the product," MiMedex was allegedly able to claim orders that had not actually yet been filled as revenue to meet its forecasts.

64.     On March 1, 2017, MiMedx filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 10-K"), providing, among other things, the Company's consolidated financial results for those periods:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)

| | Years Ended December 31, | | |
| | 2016 | 2015 | 2014 |
|---|---|---|---|
| Net sales | $ 245,015 | $ 187,296 | $ 118,223 |
| Cost of sales | 32,407 | 20,202 | 12,665 |
| Gross margin | 212,608 | 167,094 | 105,558 |
| | | | |
| Operating expenses: | | | |
| Research and development expenses | 12,038 | 8,413 | 7,050 |
| Selling, general and administrative expenses | 179,997 | 133,384 | 90,480 |
| Amortization of intangible assets | 2,127 | 933 | 928 |
| Operating income | 18,446 | 24,364 | 7,100 |
| | | | |
| Other expense, net | | | |
| Interest expense, net | (339) | (86) | (48) |
| | | | |
| Income before income tax provision | 18,107 | 24,278 | 7,052 |
| Income tax provision (expense) benefit | (6,133) | 5,168 | (832) |
| | | | |
| Net income | $ 11,974 | $ 29,446 | $ 6,220 |
| | | | |
| Net income per common share - basic | $ 0.11 | $ 0.28 | $ 0.06 |
| | | | |
| Net income per common share - diluted | $ 0.11 | $ 0.26 | $ 0.05 |
| | | | |
| Weighted average shares outstanding - basic | 105,928,348 | 105,929,205 | 105,793,008 |
| | | | |
| Weighted average shares outstanding - diluted | 112,441,709 | 113,628,482 | 113,295,504 |

65.    The 2016 10-K summarized the Company's revenue recognition practices with regard to its agreement with AvKARE as follows:

*Revenue Recognition*

The Company sells its products through a combination of a direct sales force, independent stocking distributors and third – party representatives in the U.S. and independent distributors in international markets. The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. The Company records revenues from sales to our independent stocking distributors at the time the product is shipped to the distributor. Our stocking distributors, who sell the products to their customers or sub-distributors, contractually take title to the products and assume all risks of ownership at the time of shipment. Our stocking distributors are

32

obligated to pay us the contractually agreed upon invoice price within specified terms regardless of when, if ever, they sell the products. Our stocking distributors do not have any contractual rights of return or exchange other than for defective product or shipping error; however, in limited situations, we do accept returns or exchanges at our discretion.

Some of the Company's sales to Government accounts, including the Department of Veterans Affairs, are made through a distributor relationship with AvKARE, which is a veteran-owned General Services Administration Federal Supply Schedule (FSS) contractor. The Company's agreement with AvKARE expires, subject to certain for-cause termination rights, on June 30, 2017. The Company may also elect to terminate the agreement without cause and pay a termination fee to AvKARE as specified in the agreement. Upon termination of the agreement, the parties may mutually agree to extend the agreement or the Company has an obligation to repurchase AvKARE's remaining inventory, if any, within ninety (90) days in accordance with the terms of the Agreement. At the end of the term, the parties expect AvKARE's inventory to be minimal, based upon AvKARE's obligation to use commercially reasonable efforts to achieve target sales levels over the remaining term of the agreement.

We continually evaluate new and current customers, including our stocking distributors, for collectability based on various factors including past history with the customer, evaluation of their credit worthiness, and current economic conditions. We only record revenue when collectability is reasonably assured. A portion of the Company's revenue is generated from inventory maintained at hospitals or physician's offices.

We make estimates of potential future sales returns, discounts and allowances related to current period product revenue and these are reflected as a reduction of revenue in the same period revenue is recognized. We base our estimate for sales returns, discounts and allowances on historical sales and product return information, including historical experience and actual and projected trend information as well as projected sales returns based on estimated usage and contractual arrangements with AvKARE. These estimates have historically been consistent with actual results.

66.     The 2016 10-K also assured investors of the effectiveness of the Company's internal control over financial reporting with regard to its accounting for revenue. Specifically, the Company's Form 10-K provided:

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures" within the meaning of Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the "Exchange Act". Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed by the Company in the reports filed under the Exchange Act, such as this Annual Report on Form 10-K, is recorded, processed, summarized and reported within the time periods specified in the U.S. Securities and Exchange Commission's rules and forms. Our disclosure controls and procedures include controls and procedures designed to provide reasonable assurance that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and no evaluation of controls and procedures can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. Management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by Rule 13a-15(b) of the Exchange Act, prior to filing this Annual Report on Form 10-K, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our reporting and disclosure controls and procedures were not effective as a result of the material weakness in our internal control over financial reporting discussed below.

Changes in internal controls: There were no changes in our internal control over financial reporting as defined in Exchange Act Rules 13a- 15(f) and 15d-15(f) that occurred during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Material weakness: In reviewing the Company's tax accounting in preparation for filing this Form 10-K, our management identified a deficiency in our internal control over financial reporting that is described below in Management's Annual Report on Internal Control Over Financial Reporting. Our management has concluded that this deficiency constitutes a material weakness in our internal control over financial reporting related to our accounting for income taxes. This material weakness did not result in a material misstatement of the Company's annual financial statements for the year ended December 31, 2016. However, management concluded that this material weakness, if un-remediated, could have resulted in a material misstatement of the Company's annual or

interim consolidated financial statements that would not have been prevented or detected by our internal controls. Accordingly, management determined that this control deficiency constituted a material weakness. We have developed a remediation plan for this material weakness, which is described below.

**Management's Annual Report on Internal Control Over Financial Reporting**

Our management, including our principal executive officer and principal financial officer, is responsible for establishing and maintaining adequate internal control over financial reporting. Our management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework and criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on its evaluation, our management has concluded that our internal control over financial reporting was not effective as of December 31, 2016, due to the material weakness in our internal control over financial reporting related to our accounting for income taxes. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. In reviewing the Company's tax accounting in preparation for filing this Form 10-K, management concluded the Company had a material weakness in the design of our internal control over the tax accounting related to an overstatement of an excess tax benefit which, if undetected could have resulted in an understatement of income taxes payable. Specifically, management did not have adequate supervision and review of certain technical tax accounting performed by a third party tax specialist in 2016. This was identified during the audit process prior to preparation of the Company's financial statements and, therefore did not result in a material misstatement of the Company's annual financial statements for the year ended December 31, 2016 or any of our previously issued annual or interim consolidated financial statements. This material weakness, if undetected, could have resulted in an understatement of income taxes payable, resulting in a material misstatement of the Company's annual consolidated financial statements that would not have been prevented or detected by its internal controls.

The effectiveness of our internal control over financial reporting as of December 31, 2016 has been audited by Cherry Bekaert LLP, an independent registered public accounting firm, as stated in their report which appears in Item 8 of this Annual Report on Form 10-K.

Remediation Plan: Management has begun implementing a remediation plan to address the control deficiency that led to the material weakness. The remediation plan includes the following:

- Implementing specific review procedures, including the increased involvement of our CFO and Controller as well as the hiring of an internal

tax specialist to oversee the work performed by the third- party tax specialists.

- Strengthening our income tax control with improved documentation standards, technical oversight, and training.

When fully implemented and operational, we believe the measures described above will remediate the material weakness we have identified and generally strengthen our internal control over financial reporting. We currently plan to have our enhanced review procedures and documentation standards in place and operating in the first quarter of 2017. Our goal is to remediate this material weakness by the end of the first quarter of 2017, subject to there being sufficient opportunities to conclude, through testing, that the enhanced control is operating effectively.

Cherry Bekaert LLP, an independent registered accounting firm, as auditors of our financial statements have issued an attestation report on the effectiveness of the Company's and its subsidiaries' internal control over financial reporting as of December 31, 2016. Cherry Bekaert LLP's report is included in this report.

67.    The 2016 10-K also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*. The 2016 10-K also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

68.    On May 1, 2017, MiMedx filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 10-Q"), providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

| | Three Months Ended March 31, | |
| | 2017 | 2016 |
| --- | --- | --- |
| Net sales | $ 72,607 | $ 53,367 |
| Cost of sales | 8,743 | 7,946 |
| Gross margin | 63,864 | 45,421 |
| | | |
| Operating expenses: | | |
| Research and development expenses | 4,202 | 2,496 |
| Selling, general and administrative expenses | 52,951 | 40,648 |
| Amortization of intangible assets | 526 | 810 |
| Operating income | 6,185 | 1,467 |
| | | |
| Other expense, net | | |
| Interest expense, net | (145) | (56) |
| | | |
| Income before income tax provision | 6,040 | 1,411 |
| Income tax provision (expense) benefit | (1,713) | (214) |
| | | |
| Net income | $ 4,327 | $ 1,197 |
| | | |
| Net income per common share - basic | $ 0.04 | $ 0.01 |
| | | |
| Net income per common share - diluted | $ 0.04 | $ 0.01 |
| | | |
| Weighted average shares outstanding - basic | 105,708,526 | 105,538,271 |
| | | |
| Weighted average shares outstanding - diluted | 113,730,591 | 112,039,860 |

69.   The Q1 2017 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting with regard to its accounting for revenue. Specifically, the Company provided:

**Item 4. Controls and Procedures**

**Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures" within the meaning of Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the "Exchange Act". Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed by the Company in

the reports filed under the Exchange Act, such as this Quarterly Report on Form 10-Q, is recorded, processed, summarized and reported within the time periods specified in the U.S. Securities and Exchange Commission's rules and forms. Our disclosure controls and procedures include controls and procedures designed to provide reasonable assurance that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and no evaluation of controls and procedures can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. Management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by Rule 13a-15(b) of the Exchange Act, prior to filing this Quarterly Report on Form 10-Q, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q. Based upon that evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended, were not effective because of the material weakness in our internal control over financial reporting, as described in Management's Report On Internal Control Over Financial Reporting in Item 9A of our Annual Report on Form 10-K for the year ended December 31, 2016 (the "2016 10-K"), which continues to exist as of March 31, 2017.

***Remediation of Material Weakness in Internal Control over Financial Reporting***

The Company took steps during the first quarter of 2017 to remediate its material weakness in internal control over financial reporting related to our accounting for income taxes. In reviewing the Company's tax accounting in preparation for filing the 2016 10-K, management concluded the Company had a material weakness in the design of our internal control over the tax accounting related to an overstatement of an excess tax benefit which, if undetected could have resulted in an understatement of income taxes payable. Specifically, management did not have adequate supervision and review of certain technical tax accounting performed by a third party tax specialist in 2016.

The Company has made progress implementing activities and improvements to address the control deficiency that led to the material weakness during the first quarter of 2017 which include:

- Implementing specific review procedures, including the increased involvement of our CFO and Controller.

- Beginning the process of hiring of an internal tax specialist to oversee the work performed by the third - party tax specialists.

- Strengthening our income tax control with improved documentation standards, technical oversight, and training.

When fully implemented and operational, we believe the measures described above will remediate the material weakness we have identified and generally strengthen our internal control over financial reporting. The material weakness will not be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. The Company expects to make additional improvements in internal control during the remainder of 2017. Our goal is to remediate this material weakness by the end of the 2017 fiscal year, subject to there being sufficient opportunities to conclude, through testing, that the enhanced control is operating effectively.

**Changes in Internal Control over Financial Reporting**

Other than the efforts discussed immediately above in Remediation of the Material Weakness in Internal Control over Financial Reporting, there was no change in the Company's internal control over financial reporting that occurred during the quarter ended March 31, 2017, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

70.     The Q1 2017 10-Q also discussed the ongoing litigation with its two former

employees, Jess Kruchoski and Luke Tornquist as follows:

*Former Employee Litigation*

On December 13, 2016, the Company filed lawsuits against former employees Jess Kruchoski (in the lawsuit styled MiMedx Group, Inc. v. Academy Medical, LLC, et. al. in the County Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida (the "Florida Action")) and Luke Tornquist (in the lawsuit styled MiMedx Group, Inc., v. Luke Tornquist in the Superior Court for Cobb County, Georgia, which was removed to the United States District Court for the Northern District of Georgia (the "Georgia Action")). Both the Florida and Georgia Actions assert claims against Messrs. Kruchoski and Tornquist that each of them violated their restrictive covenants entered into with the Company, that

each of them misappropriated trade secrets of the Company, that each of them tortiously interfered with contracts between the Company and its customers and employees and that each of them breached his duty of loyalty owed to the Company, among other claims.

On December 15, 2016, Messrs. Kruchoski and Tornquist filed a lawsuit in the United States District Court of Minnesota (the "Minnesota Action") against the Company and the Company's Chairman and Chief Executive Officer, Parker Petit. The plaintiffs in this lawsuit each claimed that their employment with the Company was terminated in retaliation for their complaints about the Company's alleged business practices in violation of the Dodd-Frank Act, 15 U.S.C. § 78u-6(h); and was an unlawful discharge in violation of Minnesota Statutes Section 181.931 subdivision 1. Mr. Kruchoski also claimed that the termination of his employment with the Company constituted marital status discrimination and familial status discrimination in violation of the Minnesota Human Rights Act. Messrs. Kruchoski and Tornquist also claimed that Mr. Petit tortuously interfered with their employment relationships with the Company.

On January 26, 2017, the Company and Mr. Petit filed motions to dismiss the Minnesota Action. In response, Messrs. Kruchoski and Tornquist voluntarily dismissed the Minnesota Action without prejudice on February 7, 2017. On February 7, 2017, Mr. Tornquist filed his Answer and Counterclaims in the Georgia Action wherein he asserted claims similar to those he had asserted in the Minnesota Action, with the exception that he did not include a claim of tortious interference against Mr. Petit. On February 13, 2017, the Judge in the Georgia Action entered a Consent Order enforcing the restrictive covenants against Mr. Tornquist. On February 27, 2017, the Judge in the Florida Action entered a Consent Order enforcing the restrictive covenants against Mr. Kruchoski.

On February 15, 2017, Mr. Kruchoski filed a new lawsuit in Georgia against MiMedx and Mr. Petit, making many of the same allegations in that suit as were made in the Minnesota suit, with the addition of claims against the Company and Mr. Petit for defamation. In March, MiMedx and Mr. Petit both filed motions to dismiss Mr. Kruchoski's claims, which motions are currently pending, arguing, among other things, that the claims should be brought in the Florida Action.

On December 29, 2016, MiMedx also initiated an action against former employee Mike Fox in the United States District Court for the Northern District of Illinois alleging breach of contract with respect to his restrictive covenants, breach of his duty of loyalty, breach of his fiduciary duty and for the return of certain MiMedx property.

On December 30, 2016, MiMedx initiated a lawsuit against former employee Harold Purdy and his company, Recon Medical Devices, LLC in the Texas state district court for Dallas County alleging breach of Mr. Purdy's restrictive covenants, breach of Mr. Purdy's duty of loyalty, conspiracy to breach other employees' duties to MiMedx, tortious interference, and misappropriation of trade

secrets. Mr. Purdy has a pending counterclaim against MiMedx alleging breach of contract.

The Company continues to vigorously pursue its claims asserted in all of these actions and also to vigorously defend against the lawsuits and counterclaims asserted against it.

71.     Notably, the Q1 2017 10-Q did not inform investors that Jess Kruchoski and Luke Tornquist had alleged that "[o]ver the course of their employment, Kruchoski and Tornquist discovered a fraudulent revenue recognition scheme orchestrated by MiMedx's executive leadership, including MiMedx's CEO, Parker Petit. MiMedx employed this fraudulently revenue recognition scheme to artificially inflate quarterly revenue and deceive investors."

72.     The Q1 2017 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*.  The Q1 2017 10-Q also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

73.     On July 31, 2017, MiMedx filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2017 (the "Q2 2017 10-Q"), providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | 2017 | 2016 |
| Net sales | $ 76,412 | $ 57,342 | $ 149,019 | $ 110,710 |
| Cost of sales | 8,631 | 7,394 | 17,374 | 15,341 |
| Gross margin | 67,781 | 49,948 | 131,645 | 95,369 |
| | | | | |
| Operating expenses: | | | | |
| Research and development expenses | 4,747 | 3,168 | 8,949 | 5,664 |
| Selling, general and administrative expenses | 55,314 | 42,772 | 108,265 | 83,420 |
| Amortization of intangible assets | 507 | 447 | 1,033 | 1,257 |
| Operating income | 7,213 | 3,561 | 13,398 | 5,028 |
| | | | | |
| Other expense, net | | | | |
| Interest expense, net | (149) | (111) | (294) | (167) |
| | | | | |
| Income before income tax provision | 7,064 | 3,450 | 13,104 | 4,861 |
| Income tax (provision) benefit | 1,005 | (1,475) | (708) | (1,689) |
| | | | | |
| Net income | $ 8,069 | $ 1,975 | $ 12,396 | $ 3,172 |
| | | | | |
| Net income per common share - basic | $ 0.08 | $ 0.02 | $ 0.12 | $ 0.03 |
| | | | | |
| Net income per common share - diluted | $ 0.07 | $ 0.02 | $ 0.11 | $ 0.03 |
| | | | | |
| Weighted average shares outstanding - basic | 106,805,162 | 106,191,932 | 106,254,433 | 105,873,727 |
| | | | | |
| Weighted average shares outstanding - diluted | 117,285,865 | 112,148,415 | 115,856,317 | 112,095,051 |

74.    The Q2 2017 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*. The Q2 2017 10-Q also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

75.    On August 10, 2017, MiMedx disclosed on Form 8-K that it had dismissed its long-time independent registered public accounting firm, Cherry Bekaert LLP, replacing the firm with Ernst & Young LLP.

42

76.     In early September, an investigative news company, The Capital Forum, issued a report stating that it had confirmed that "[t]he VA Office of Inspector General (OIG) is conducting an investigation that involves documents related to MiMedx."   On September 7, 2017, MiMedx responded with a press release stating that it was not the subject of any such investigation. Specifically, the

Company stated:

> MiMedx has been aware for some time of an ongoing investigation by the Department of Veterans Affairs ("VA") Office of Inspector General, but the Company is not a target of that investigation. The Company is assisting with the investigation as requested by the government. To the extent there has been any innuendo by The Capitol Forum or others that somehow MiMedx is a target, that is simply incorrect based on available information.

77.     On September 20, 2017, two research groups often referred to as "short reporters" – Aurelius Value and Viceroy Research – published separate reports targeted at MiMedx detailing a number of red flags indicating potential fraudulent activity. For instance, the Aurelius Value report entitled "MiMedx:

Flying Too Close To The Sun" summarized its findings as follows:

> We see large undiscounted channel stuffing and kickback risks lurking beneath the surface at MiMedx (NASDAQ: MDXG). This report specifically exposes:
>
> ▪ Undisclosed related party transactions and entanglements with distributors, including a key MiMedx distributor that has been controlled by an insider. These relationships are especially problematic because secret ties to distributors have featured prominently in historical channel stuffing schemes.
>
> ▪ Detailed allegations that MiMedx's channel stuffing scheme relies on at least three more distributors who have undisclosed special agreements involving millions in discounted product and favorable financing terms as "house accounts". Not only does the alleged scheme now extend significantly beyond the VA, but MiMedx has allegedly manipulated its financials through multiple avenues to hit sales targets.
>
> ▪ Documents showing that over 40 podiatrists across the country, including the current President of the American Podiatric Medical Association,

received undisclosed membership interests in a MiMedx reseller linked to MiMedx affiliates. The HHS Office of Inspector General has declared physician owned distributors as "inherently suspect" in a special fraud alert.

The research mosaic at MiMedx stirs memories of ArthroCare, a medical device company with a similar revenue recognition policy that inflated sales by "parking" millions in product at distributors before period ends. ArthroCare's fraud relied on a distributor secretly controlled by insiders, which metastasized alongside a scandal involving improper relationships with doctors.

78.    In response, MiMedx sued The Capital Forum in late September 2017 alleging, among other things libel, slander, and defamation. On October 4, 2017, MiMedx took the same tract with Aurelius Value and Viceroy Research, suing them in Federal Court in the Southern District of New York. Among other things, MiMedx labeled the allegations of "channel-stuffing" in the Aurelius Value and Viceroy Research reports (which rehashed claims by former employees made in the Whistleblower Lawsuit) as "false."

79.    On October 31, 2017, MiMedx filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2017 (the "Q3 2017 10-Q"), providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Net sales | $ 84,573 | $ 64,429 | $ 233,592 | $ 175,139 |
| Cost of sales | 9,599 | 7,997 | 26,972 | 23,338 |
| Gross margin | 74,974 | 56,432 | 206,620 | 151,801 |
| | | | | |
| Operating expenses: | | | | |
| Research and development expenses | 5,481 | 2,919 | 14,430 | 8,582 |
| Selling, general and administrative expenses | 60,233 | 48,179 | 168,498 | 131,599 |
| Amortization of intangible assets | 418 | 631 | 1,451 | 1,889 |
| Operating income | 8,842 | 4,703 | 22,241 | 9,731 |
| | | | | |
| Other income (expense) | | | | |
| Gain on divestiture | 4,274 | — | 4,274 | — |
| Interest expense, net | (43) | (87) | (337) | (254) |
| | | | | |
| Income before income tax provision | 13,073 | 4,616 | 26,178 | 9,477 |
| Income tax provision (expense) benefit | 4,384 | (1,295) | 3,675 | (2,984) |
| | | | | |
| Net income | $ 17,457 | $ 3,321 | $ 29,853 | $ 6,493 |
| | | | | |
| Net income per common share - basic | $ 0.16 | $ 0.03 | $ 0.28 | $ 0.06 |
| | | | | |
| Net income per common share - diluted | $ 0.15 | $ 0.03 | $ 0.26 | $ 0.06 |
| | | | | |
| Weighted average shares outstanding - basic | 106,871,436 | 105,991,990 | 106,469,278 | 105,927,890 |
| | | | | |
| Weighted average shares outstanding - diluted | 117,501,925 | 112,361,179 | 116,547,006 | 112,193,701 |

80.    The Q3 2017 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶30, *supra*.  The Q3 2017 10-Q also contained certifications pursuant to SOX signed by the Individual Defendants, substantially similar to the certifications described in ¶28, *supra*.

81.    On January 8, 2018, MiMedx issued a press release entitled "MiMedx Releases Preliminary 2017 Revenue of $324.5 Million representing a 32% increase over 2016," and filed

the same on Form 8-K with the SEC disclosing, among other things, the Company's preliminary fourth quarter and full year 2017 financial results. Among other things, the Company's January 8, 2018 press release provided:

> **Marietta, Georgia**, January 7, 2018, (PR Newswire) – MiMedx Group, Inc. (NASDAQ: MDXG), the leading biopharmaceutical company developing and marketing regenerative and therapeutic biologics utilizing human placental tissue allografts with patent-protected processes for multiple sectors of healthcare, today announced preliminary record revenue results for the fourth quarter and full-year 2017 and revenue expectations for the first quarter of 2018.

**Fourth Quarter 2017 Revenue Highlights**

- **Q4 2017 revenue of $90.9 Million grew 30% over Q4 2016 revenue and exceeded upper end of guidance by nearly $3 million**

- **Excluding divested subsidiary, Stability Biologics, Q4 2017 revenue grew by 34% over Q4 2016**

- **Q4 2017 Wound Care revenue grew 27% over Q4 2016**

- **Surgical, Sports Medicine and Orthopedics (SSO) revenue for Q4 2017 grew 40% over Q4 2016**

**Full-Year 2017 Revenue Highlights**

- **Full-year 2017 revenue of $324.5 million increased 32% over full year 2016 and exceeded upper end of guidance**

- **Excluding divested subsidiary, Stability Biologics, full-year 2017 revenue grew by 36% over 2016**

- **Full-year 2017 Wound Care revenue of $238.3 million increased by 30% over 2016**

- **Full-year 2017 SSO revenue of $86.2 million grew 41% over 2016**

The Company recorded preliminary record revenue for the year ended December 31, 2017 of $324.5 million, a $79.5 million or 32% increase over 2016 revenue of $245.0 million. The Company recorded record revenue for the 2017 fourth quarter of $90.9 million, a $21.0 million or 30% increase over 2016 fourth quarter revenue of $69.9 million.

**Management Commentary**

Parker H. "Pete" Petit, Chairman and CEO stated, "The fourth quarter of 2017 makes 28 consecutive quarters of sequential revenue growth and 27 of 28 quarters of meeting or exceeding our revenue guidance. At the end of November, we expected we would exceed our revenue forecast for the quarter, as we indicated in our press release on November 30, 2017. We forecasted December to be a solid growth month, and our sales force more than lived up to our expectations with a robust month to close out the year. We are entering 2018 with strong momentum that should produce an exciting 2018."

Bill Taylor, President and COO, noted, "Contributing to our accelerating sales momentum is the market growth we have achieved with our refined territory analytics for the larger markets and our effective secondary market strategy. The significant prospects for Venous Leg Ulcer (VLU) reimbursement coverage being added during 2018 as a result of the publication of the compelling results confirming the clinical efficacy of EpiFix® in the treatment of VLUs, will further fuel this momentum. As we stated earlier, with our current breadth of commercial carrier reimbursement coverage primarily for Diabetic Foot Ulcers (DFUs), we expect our 2018 Wound Care growth to be aided by our ability to ultimately achieve over 100 million additional commercial lives having EpiFix coverage for the treatment of VLUs."

"Both of our sales verticals had strong performances during the fourth quarter. Wound Care performed extremely well in the fourth quarter with 27% growth over the prior year's fourth quarter, and SSO revenue grew significantly over 2016 with 40% quarter over quarter growth. Fourth quarter revenue from our direct sales force represented approximately 95% of total revenue, and revenue from distributors and Original Equipment Manufacturers (OEMs) accounted for less than 5% of total fourth quarter revenue," Taylor added.

82.    The statements referenced in ¶¶ 25-62, 64-70, 72-76, and 78 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) MiMedx engaged in a "channel-stuffing" scheme designed to inappropriately recognize revenue that had not yet been realized; (ii) MiMedx failed to disclose its financial ties to physicians, as required by federal law; (iii) the Company lacked adequate internal controls over financial reporting; and (iv) as a result of the foregoing, MiMedx shares traded at artificially

inflated prices during the Class Period, and class members suffered significant losses and damages.

## The Truth Begins to Emerge

83.     On February 20, 2018, MiMedx issued a press release entitled "MiMedx Postpones Release of its Fourth Quarter and Fiscal Year 2017 Financial Results," announcing that its audit committee "ha[d] engaged independent legal and accounting advisors to conduct an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company."   MiMedx advised investors that "Company executives are also reviewing, among other items, the accounting treatment of certain distributor contracts."   The Company further announced that, because of this internal investigation, it would delay the release of its fourth quarter and fiscal year 2017 financial results.  The press release stated in relevant part:

> **Marietta, Georgia**, February 20, 2018 -- MiMedx Group, Inc. (NASDAQ: MDXG), a leading developer and marketer of regenerative and therapeutic biologics, today announced that it will postpone the release of its financial results, as well as the filing of its Form 10-K, for the year ended December 31, 2017.
>
> The Audit Committee of MiMedx's Board of Directors has engaged independent legal and accounting advisors to conduct an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company. Company executives are also reviewing, among other items, the accounting treatment of certain distributor contracts.
>
> The Audit Committee is working closely with its advisors to complete this investigation in as timely a manner as possible. The Company will not be in a position to release its financial results until the Audit Committee's internal investigation is completed.
>
> The Company believes, based on information available to date, that the outcome of such investigation should not have a material impact on revenue guidance for 2018. The Company's unaudited cash and cash equivalents as of December 31, 2017 were approximately $33 million, after giving effect to the use of approximately $24 million for share repurchases in the fourth quarter of 2017 as part of the Company's Share Repurchase Program. The Company had no debt

outstanding as of December 31, 2017. The Company also does not expect this delay to affect its operational performance and clinical research activities.

"Our Board of Directors and executives believe it is in the best interests of our Company and shareholders for our Audit Committee to address these allegations in an internal investigation with the support of independent legal and accounting advisors. We look forward to releasing our 2017 financial results as soon as this process is complete," said Parker H. "Pete" Petit, Chairman and CEO. "MiMedx has been experiencing rapid growth over the last few years as our product portfolio continues to meet significant, unmet needs in the marketplace. We are literally saving lives by saving limbs, and we expect to continue to deliver operational and clinical success in the months and years to come."

84.     On this news, MiMedx's share price fell $5.72, or 39.53%, to close at $8.75 on February 20, 2018.

85.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

86.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired MiMedx securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

87.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, MiMedx securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds

or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MiMedx or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

88.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

89.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

90.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of MiMedx;

- whether the Individual Defendants caused MiMedx to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of MiMedx securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

50

91.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

92.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- MiMedx  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold MiMedx securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

93.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

94.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

95.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

96.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

97.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MiMedx securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire MiMedx securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

98.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly

and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for MiMedx securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about MiMedx's finances and business prospects.

99.     By virtue of their positions at MiMedx, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

100.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of MiMedx, the Individual Defendants had knowledge of the details of MiMedx's internal affairs.

101.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of MiMedx.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to MiMedx's

businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of MiMedx securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning MiMedx's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired MiMedx securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

102.    During the Class Period, MiMedx securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of MiMedx securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of MiMedx securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of MiMedx securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

103.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

104.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

105.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

106.    During the Class Period, the Individual Defendants participated in the operation and management of MiMedx, and conducted and participated, directly and indirectly, in the conduct of MiMedx's business affairs.  Because of their senior positions, they knew the adverse non-public information about MiMedx's misstatement of income and expenses and false financial statements.

107.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to MiMedx's financial condition and results of operations, and to correct promptly any public statements issued by MiMedx which had become materially false or misleading.

108.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which MiMedx disseminated in the marketplace during the Class Period concerning MiMedx's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause MiMedx to engage in the wrongful acts

complained of herein. The Individual Defendants therefore, were "controlling persons" of MiMedx within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of MiMedx securities.

109.    Each of the Individual Defendants, therefore, acted as a controlling person of MiMedx.  By reason of their senior management positions and/or being directors of MiMedx, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, MiMedx to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of MiMedx and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

110.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by MiMedx.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

56

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: February 28, 2018

Respectfully submitted,

**POMERANTZ LLP**
*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***